**Opinion filed December 9, 2021**



## In The

# Eleventh Court of Appeals

_____

## No. 11-19-00343-CR

_____

## MITCHELL WAYNE ROBERTSON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**

**Brown County, Texas**

**Trial Court Cause No. CR26729**

### O P I N I O N

The jury convicted Mitchell Wayne Robertson of possession of a controlled substance in a drug-free zone and assessed his punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a period of thirty years after Appellant pleaded "true" to two prior felony convictions alleged for enhancement purposes. Appellant challenges his conviction and sentence in three issues. We affirm.

*Background Facts*

On September 29, 2018, James McMillian Sr. (McMillian Sr.) and James McMillian Jr. (McMillian Jr.) learned that Appellant stole McMillian Jr.'s lawnmower. Shortly after learning this information, McMillian Jr. located Appellant and confronted him about the lawnmower. Appellant admitted that he took the lawnmower and offered to take McMillian Jr. to the lawnmower. McMillian Sr. and Amber McMillian (McMillian), McMillian Jr.'s wife, accompanied McMillian Jr. to the location where Appellant had stored the lawnmower. As they were in route to the location, McMillian Sr. flagged down two police officers and asked them to follow him.

McMillian Jr., McMillian Sr., and McMillian followed Appellant to 1115 Santa Clara Drive, which turned out to be Appellant's sister's house. McMillian Jr. and McMillian arrived at the location before McMillian Sr. and the police arrived. Brownwood Police Officers Shade Tidwell and Ray Slayton were the first officers on the scene. Once Appellant realized that the police had arrived, he took off running. McMillian noticed that Appellant threw something down as he began running.

Officer Slayton began pursuing Appellant on foot. The chase lasted around five minutes and ended with Officer Trever Sears, who arrived after Officer Slayton did, locating Appellant hiding in the laundry room of the Santa Clara residence. Once the police officers were able to arrest Appellant, Officer Sears searched Appellant and found female jewelry in his pocket. After searching Appellant, officers transported Appellant to the Brown County Jail. Officer Slayton then found a green baggie located in the front yard of the Santa Clara residence.

Officer Tidwell knew that Appellant drove the pickup found at the Santa Clara residence because McMillian Jr. and Appellant's sister confirmed to Officer Tidwell that the pickup was Appellant's pickup. Officer Tidwell then conducted an

inventory search of Appellant's pickup. Officer Tidwell inventoried all items within the cab and the bed of the pickup. However, Officer Tidwell did not inventory the locked toolbox in the bed of the pickup. Following the inventory, the police officers had the pickup impounded. The State introduced evidence that showed that the Santa Clara Drive address was within 1,000 feet of Trigg Park.

In the days following Appellant's arrest, Detective Kris Salazar began investigating Appellant's case. Detective Salazar's investigation into Appellant started as a potential theft investigation. Detective Salazar learned that Appellant had been driving the pickup, but the pickup was still registered to Donald Robertson (Robertson), Appellant's brother. Upon learning this information, Detective Salazar contacted Robertson and visited him at his residence. During this visit, Robertson informed Detective Salazar that Appellant had had Robertson's permission to drive the pickup for the past several months. Robertson testified that he gave the pickup to Appellant around Christmas 2017. However, it is unclear from the record whether Detective Salazar knew that Robertson had given Appellant the pickup, or whether Robertson was just allowing Appellant to temporarily use the pickup.

On October 4, 2018, Robertson agreed to meet with Detective Salazar at the impound lot where the pickup was taken following Appellant's arrest. Robertson signed a consent form allowing Detective Salazar to search the pickup. However, Robertson did not have a key to the toolbox on the pickup. Additionally, Detective Salazar did not know that Robertson did not attach the toolbox to the pickup but, rather, that Appellant had done so. At trial, a factual dispute arose as to who opened the lock on the toolbox. Detective Salazar testified that Robertson opened the toolbox, and Robertson testified that he did not remember opening it and believed the toolbox was already opened when he arrived at the impound lot. Once opened, Detective Salazar found two pipes, a baggie containing a crystalized substance, and a butane lighter.

3

The green baggie discovered at the Santa Clara residence and the items seized from the toolbox were sent to the Abilene Crime Lab to test for the presence of any illegal substances. The test conducted on the crystal substance recovered from the toolbox revealed that the substance contained methamphetamine. Due to an Abilene Crime Lab policy, the green baggie from the Santa Clara residence was never tested. However, Sarah McGregor, the crime lab analysist, noted that the green baggie had residue in it.

During trial, Appellant filed a motion titled "Motion to Suppress Or Alternatively Motion For 38.23 Instruction to the Jury." The trial court took this motion under advisement and did not rule on the motion until the following day. The trial court denied Appellant's motion to suppress but granted Appellant's request for an Article 38.23 jury instruction.

*Analysis*

*Sufficiency of the Evidence*

Appellant challenges the sufficiency of the evidence in his second and third issues. In Appellant's second issue, he contends that the evidence was insufficient to establish his possession of the methamphetamine. In Appellant's third issue, he contends that the evidence was insufficient to show that he possessed the narcotics in a drug-free zone.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson* 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

4

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight witness testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

In his second issue, Appellant asserts that the evidence at trial was insufficient to show that he intentionally or knowingly possessed methamphetamine. He contends that the evidence is insufficient because the methamphetamine recovered from the pickup's toolbox was found five days after his arrest in an area that was not

readily accessible to Appellant. Appellant asserts that other people had access to the pickup and that others drove it.

A person is guilty of possession of a controlled substance if he or she intentionally or knowingly possessed the controlled substance. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(a) (West Supp. 2021). The Health and Safety Code defines possession as "actual care, custody, control, or management." *Id.* at § 481.002(38).

To prove unlawful possession of a controlled substance, the State must show (1) that the accused exercised control, management, or care over the substance and (2) that the accused knew the matter possessed was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005), *overruled in part on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015); *Hughitt v. State*, 539 S.W.3d 531, 538 (Tex. App.—Eastland 2018), *aff'd*, 583 S.W.3d 623 (Tex. Crim. App. 2019). The evidence must establish that the accused's connection with the drugs is more than just his fortuitous proximity to someone else's drugs. *Poindexter*, 153 S.W.3d at 405–06; *Hughitt*, 539 S.W.3d at 538.

Texas courts have formulated the "affirmative links rule," which provides that, "[w]hen the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband." *Poindexter*, 153 S.W.3d at 406 (alteration in original) (quoting *Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981)); *see Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006) (listing affirmative links recognized by courts); *see also Tate v. State*, 500 S.W.3d 410, 413–14 (Tex. Crim. App. 2016) (citing *Evans*, 202 S.W.3d at 162 n.12). The affirmative links rule is routinely employed to establish possession when the accused is not in exclusive possession of the place where the

6

drugs are found. *Poindexter*, 153 S.W.3d at 406. "This rule simply restates the common-sense notion that a person—such as a father, son, spouse, roommate, or friend—may jointly possess property like a house but not necessarily jointly possess the contraband found in that house." *Id.*

The following links have been applied to infer knowledge relating to the contraband: (1) the accused's presence when the search was executed; (2) whether the contraband was in plain view; (3) the accused's proximity to and the accessibility of the contraband; (4) whether the accused was under the influence of a controlled substance when he was arrested; (5) whether the accused possessed other contraband or narcotics when arrested; (6) whether the accused made incriminating statements; (7) whether the accused attempted to flee; (8) whether the accused made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia was present; (11) whether the accused owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the accused was found with a large amount of cash; and (14) whether the conduct of the accused indicated a consciousness of guilt. *Tate*, 500 S.W.3d at 414 (citing *Evans*, 202 S.W.3d at 162 n.12). It is not the number of links that is dispositive; rather, it is the logical force of all of the evidence, both direct and circumstantial, that is the determining factor. *Evans*, 202 S.W.3d at 162.

Detective Salazar testified as follows regarding what officers found in the toolbox:

> A glass bubble pipe, commonly used, in my training that I've seen, as a meth pipe. It had some burnt residue on there, and then there was a clear baggie tucked in one of the little sleeves, which contained a crystalized substance that, from my training, recognized to possibly be meth and a little butane lighter torch.

Additionally, Detective Salazar found a second pipe within the toolbox, which he testified was a marihuana pipe.

According to Robertson, he gave Appellant the pickup in December 2017, and Appellant had been driving the pickup through the time of his arrest in September 2018. Additionally, Appellant attached the locked toolbox to the pickup after he received it from Robertson. Appellant contends that the evidence was insufficient to show that he possessed the drugs because the State did not disprove that the drugs were not in the possession of one of the many other people Appellant let drive the pickup. However, Robertson testified that he had no key to the locked toolbox and that Appellant did not allow other people to borrow the pickup "real often."

Additionally, two witnesses testified about Appellant's physical appearance at the time of his arrest. Officer Slayton testified that Appellant appeared as follows:

> He seemed -- he seemed skinny then. His face was sunk in. The little bit that I did speak with him, he spoke pretty quickly. During the movements in the back yard where -- where I was in pursuit, especially at the point where he was on the ground trying to get up, I'd say he had a lot of furtive and erratic movements . . . .

Officer Slayton indicated that these were all signs of methamphetamine use. McMillian Jr. testified that he had observed people under the influence of methamphetamine and there was "no doubt" in his mind Appellant was under the influence of methamphetamine. Specifically, McMillian Jr. stated that Appellant was "[k]ind of moving around a little fast -- fast movement." Taken together, a reasonable jury could conclude that Appellant knowingly possessed the methamphetamine located within the locked toolbox. We overrule Appellant's second issue.

In Appellant's third issue, he contends that the evidence was insufficient to show that he possessed the methamphetamine within a drug-free zone. Appellant asserts that "[t]he State should not be able to transport a controlled substance found

8

miles away and five days later to a separate location for the only purpose of making a drug-free zone applicable." Knowingly possessing a controlled substance within one thousand feet of playground enhances the punishment. TEX. HEALTH & SAFETY CODE ANN. § 481.134(b)(1) (West Supp. 2021). It is irrelevant whether the defendant knew that he or she was in a drug-free zone when he or she possessed the drugs. *White v. State*, 509 S.W.3d 307, 315 (Tex. Crim. App. 2017).

Here, the uncontradicted testimony from Gary Hurtado, the GIS Coordinator for the City of Brownwood, established that the residence where Appellant's pickup was located when he was arrested was 885 feet from Trigg Park. Trigg Park contains various items of playground equipment. Thus, contrary to Appellant's assertion, the pickup was not towed to a location within a drug-free zone, but rather the pickup was present in a drug-free zone because that is the location where Appellant parked the pickup.

Appellant also asserts that the drug-free zone enhancement should not apply because the drugs were not located within the drug-free zone when Detective Salazar found them. *Bridges v. State*, 454 S.W.3d 87 (Tex. App.—Amarillo 2014, pet. ref'd), is instructive. In *Bridges*, the defendant was arrested within a drug-free zone, but the police did not discover that the defendant possessed methamphetamine until he was later searched at the police station. 454 S.W.3d at 88. The Amarillo Court of Appeals affirmed the conviction even though the police did not learn that the defendant possessed methamphetamine until after he was removed from the drug-free zone. *Id.* at 89.

The circumstances in *Bridges* are nearly identical to the facts in this case. When police arrested Appellant, his pickup was within a drug-free zone. The police did not learn that the pickup contained methamphetamine until it was searched at the impound lot outside a drug-free zone. We have already determined that the evidence was sufficient to establish that Appellant possessed the methamphetamine found in

the pickup. A reasonable jury could have also found that Appellant possessed the methamphetamine within a drug-free zone based on the pickup's location at the time of Appellant's arrest. Therefore, we overrule Appellant's third issue.

*Motion to Suppress*

In his first issue, Appellant asserts that the trial court erred by overruling his motion to suppress the contents of the toolbox. He contends that his right to privacy was violated when the police searched the toolbox attached to the pickup. Specifically, Appellant contends that Robertson lacked actual authority to consent to the search of the pickup and that Detective Salazar could not reasonably believe that Robertson had apparent authority to consent to a search of the pickup.

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018) (citing *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016)); *see Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997). At a hearing on a motion to suppress, the trial judge is the sole trier of fact and judge of the credibility of witnesses and the weight to be given to their testimony. *Lerma*, 543 S.W.3d at 190 (citing *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). Therefore, we afford almost complete deference to the trial court in determining historical facts. *Id.* (citing *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)). "When a trial judge makes express findings of fact, an appellate court must examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record." *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017) (citing *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010)). "The appellate court then proceeds to a de novo determination of the legal significance of the facts as found by the trial court—including the determination of

10

whether a specific search or seizure was reasonable." *Id.* (citing *Kothe v. State*, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004)).

In denying the motion to suppress, the trial court stated that "the State had the right to rely on the -- either the actual or apparent authority of the brother." Consent is an established exception to the warrant requirement. *Id.* at 10 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). A third party can consent to a search to the detriment of another's privacy interest if the third party has actual authority over the place or thing to be searched. *Id.* at 19 (citing *United States v. Matlock*, 415 U.S. 164, 170 (1974); *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010)). "But actual authority is not necessarily a prerequisite for a valid consensual search. If an officer reasonably, though mistakenly, believes that a third party purporting to provide consent has actual authority over the place or thing to be searched, apparent authority exists." *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990); *Hubert*, 312 S.W.3d at 561). "Apparent authority is judged under an objective standard: 'Would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?'" *Id.* (quoting *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011)).

Because of societal understanding and expectations, the driver of a vehicle typically has a superior right to consent to a search of the vehicle as compared to the occupants of a vehicle. *State v. Copeland*, 399 S.W.3d 159, 163–64 (Tex. Crim. App. 2013). But "[a]fter a vehicle is stopped on a public roadway, events may transpire that change the positions of the occupants in the hierarchy of the vehicle and that would likely change society's expectations with respect to which occupant controls the vehicle." *Id.* at 164 (citing examples of events that "would likely change society's expectations to include consideration of a passenger's control over the vehicle as equal, and possibly superior, to that of the driver"). For example, the

11

driver may give control of the vehicle to a passenger after he is arrested, and thus "a driver's control may quickly and unexpectedly be relegated to another as circumstances change." *Id.* at 164–65 (citing *Welch v. State*, 93 S.W.3d 50, 53 (Tex. Crim. App. 2002)).

*Copeland* involved a driver that consented to a search of a vehicle. 399 S.W.3d at 160. However, a passenger claiming to be the owner of the vehicle objected to the search. *Id*. In *Georgia v. Randolph*, 547 U.S. 103, 123 (2006), the U.S. Supreme Court held that a co-tenant of a residence may disallow police to search a residence after a fellow tenant has consented to a search. In *Copeland*, the Texas Court of Criminal Appeals held that the holding in *Randolph* does not extend to vehicle occupants to permit an objecting vehicle occupant to disallow consent given by another occupant. 399 S.W.3d at 159–64.

In *Welch*, after the driver gave control of the vehicle to a passenger post-arrest, the passenger gave police consent to search the vehicle. The Texas Court of Criminal Appeals concluded that the consent from the passenger was effective even though the driver, who was also the owner of the vehicle, had previously refused consent to search because at the time the passenger consented to the search, she had equal control and equal use of the vehicle. *Welch*, 93 S.W.3d at 52–53; *see Copeland*, 399 S.W.3d at 166 n.7 (discussing *Welch*).

Here the circumstances do not pit a driver's non-consent against a passenger's consent as was the case in *Welch*, but rather it pits the consent of the registered owner of a vehicle versus the non-consent of a driver that had been a permissive user of the vehicle for several months. This case requires us to determine if a reasonable officer would believe that Robertson, as the registered owner of the vehicle, had at least the apparent authority to give consent to a search of the vehicle if Roberston had given Appellant the use of the vehicle and Appellant refused to give consent for a search. We conclude that a registered owner in Robertson's position would have at least

12

apparent authority to consent to a search of the vehicle even though Appellant had refused to give consent.

Robertson attempted to retrieve the pickup on multiple occasions after Appellant's arrest. At the time that the police arrested Appellant, Robertson drove to the Santa Clara residence and spoke with police to see if he could take the pickup with him without it being impounded. Following his attempted retrieval of the pickup on the day of Appellant's arrest, Robertson called the police daily to see if he could retrieve the pickup after it was impounded. Robertson testified that he wanted to retrieve the pickup because "it's in my name" and because he wanted to avoid the daily charges for the pickup to remain impounded. Robertson undertook these actions as the registered owner of the pickup irrespective of the fact that he had purportedly given the pickup to Appellant.

A significant element of our analysis is the fact that the vehicle was impounded after Appellant's arrest. Jerry Wetherholt, the tow truck driver that towed the pickup to the impound yard, testified that the registered owner is permitted to retrieve property from an impounded vehicle or to obtain the release of the vehicle from the impound yard. In that regard, the operator of a vehicle storage facility who receives an impounded vehicle that is towed to the facility must send a written notice to the registered owner of the vehicle. TEX. OCC. CODE ANN. § 2303.151(a) (West Supp. 2021). Furthermore, the registered owner of the vehicle is entitled to claim possession of the vehicle. *See id.* § 2303.154(b)(3) (noting that the failure of the owner to claim possession within thirty days of being provided notice of impoundment constitutes a waiver by that person of all right, title, or interest in the vehicle). After the methamphetamine was found, the impound yard released the vehicle to Robertson, and he continued to possess it at the time of trial.

As the registered owner of the impounded pickup, Robertson had at least the right to equal control of the vehicle as did Appellant and a greater right of possession

13

under the impound statutes. Thus, at a minimum, Robertson had apparent authority to consent to a search of the vehicle irrespective of Appellant's prior refusal to give consent to search. *See Copeland*, 399 S.W.3d at 159–64; *Welch*, 93 S.W.3d at 52–53. Accordingly, the trial court did not err in overruling Appellant's motion to suppress. We overrule Appellant's first issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

JOHN M. BAILEY

CHIEF JUSTICE

December 9, 2021

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

14